UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **DENNIS E. HOLMAN AND YOLANDA HOLMAN** | **CIVIL ACTION 11-1864** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **W-INDUSTRIES OF LOUISIANA, LLC, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

Pending before the Court is a Motion for Summary Judgment [Doc. No. 120] filed by Defendant Nabors Drilling USA, LP ("Nabors"). Plaintiffs Dennis and Yolanda Holman ("the Holmans") have filed an opposition memorandum [Doc. No. 125], and Nabors has filed a reply memorandum [Doc. No. 129].

**I.     FACTS AND PROCEDURAL HISTORY**

Dennis Holman ("Holman") worked as a production operator for Greystar Corporation ("Greystar) aboard the ATP TITAN, a complex structure serving as both a drilling platform and production facility in the Telemark Field in the Gulf of Mexico.

On November 3, 2010, Holman was in the galley eating cereal. He heard a loud "boom" and felt the platform sway. [Doc. No. 120, Exhibit A, Holman Depo., pp. 89-90]. After that, the Emergency Shut Down and Deluge System ("ESDDS") was activated. The lights went out, and the abandon platform alarm began sounding.

There were reports of a gas release from the process area. Therefore, Holman's supervisor, Deral Cox ("Cox"), sent him below the platform to "kill the electrical pump" and stop any release. *Id.*

Because the water deluge system had begun to operate, spraying the platform with tens of thousands of gallons of water in order to suppress a potential fire, the piping and deck were wet and slippery. As Holman ascended a stairwell, his grip slipped, he stumbled backwards, and injured his back.

After the accident, Holman returned to the control room. By that time, the lights were back on, and the emergency generator was operating. Holman took off the remainder of his shift and was returned to shore by helicopter the next day. He did not return to work.

It was later determined that the entire event was a false alarm. However, Holman did not know what activated the ESDDS, the abandon platform warning, and the deluge system. He was told that the noise he heard was the sound of a grocery box hitting the living quarters on the ATP Titan when the Nabors crane operator was trying to lift the box, but Holman has no personal knowledge of what caused the ESDDS activation and resulting issues.

Cody Dupre ("Dupre"), who was employed by Greystar as the Lead I & E Technician[1] on the ATP Titan, was the "go-to person on the investigation" of the ESDDS activation and prepared the official Incident Report. [Doc. No. 120, Exh. D, Dupre Depo., p. 116]; [Doc. No. 125, Exh. 1]. Dupre did not find any connection between the impact of the grocery box on the handrail and the activation of the ESDDS, the abandon platform warning, and the deluge system.

---

[1] "I & E" presumably refers to instrumentation and electrical technician.

On October 21, 2011, the Holmans brought suit against W-Industries of Louisiana, LLC ("W-Industries"), asserting claims under the Outer Continental Shelf Lands Act ("OCSLA").[2] The Holmans allege that W-Industries, which performed repair and maintenance services on the ATP Titan, are liable because its technicians negligently set the low voltage "trip level" for the ESDDS at 23 volts, rather than 21 volts, which, in turn, caused the circuit breakers to trip unnecessarily. The battery supplying power was drained and allegedly caused the scenario resulting in Holman's incident. Mrs. Holman also asserted a loss of consortium claim under Louisiana law.

On June 1, 2012, with leave of Court, the Holmans amended their Complaint. [Doc. No. 13]. As it was unclear whether the ATP Titan might be considered a vessel, rather than a platform, the Holmans amended to assert a maritime claim. The Holmans also added Emerson Network Power, Liebert Services, Inc. ("Emerson"), because it was alleged that an Emerson employee was responsible for setting the low trip level.

On August 10, 2012, W-Industries filed a Third Party Demand against Nabors, among others. [Doc. No. 23].

On June 23, 2014, the Holmans filed a Third Supplemental and Amended Complaint adding Nabors as a Defendant. [Doc. No. 104].

On October 10, 2014, Nabors filed the instant Motion for Summary Judgment [Doc. No. 120].[3] The Holmans timely filed an opposition memorandum [Doc. No. 125]. Nabors filed a reply memorandum. [Doc. No. 129]. The Court is now prepared to rule.

---

[2] The incident occurred on the Outer Continental Shelf in the Gulf of Mexico.

[3] Nabors also filed a Rule 12(c) Motion for Judgment on the Pleadings [Doc. No. 119], but the Court has first considered the summary judgment motion.

## II. LAW AND ANALYSIS

### A. Standard of Review

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

### B. Cause-in-Fact

The Holmans have asserted a negligence action against Nabors. To determine whether a plaintiff should recover on a negligence claim, Louisiana courts employ a duty-risk analysis. *Long v. State ex rel. Dept. of Transp. and Dev.*, 916 So.2d 87, 101 (La. 2005). Under the duty-risk analysis, a plaintiff must demonstrate that (1) the defendant had a duty to conform to a specific standard of care

(duty); (2) the defendant failed to conform its conduct to that standard (breach); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (cause-in-fact); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (legal causation or scope of liablity); and (5) that he suffered actual damages (damages). *See Mathieu v. Imperial Toy Corp.*, 94-C-0952, p. 5 (La. 11/30/94); 646 So.2d 318, 322 (citations omitted); *Long v. State ex rel. Dept. of Transp. and Dev.*, 04–0485, p. 21 (La. 6/29/05); 916 So.2d 87, 101 (citations omitted). A plaintiff's failure to prove any of the elements of the duty-risk analysis results in a determination of no liability. *Lemann v. Essen Lane Daiquiris, Inc.*, 05–1095 (La. 3/10/06); 923 So.2d 627.

To meet the cause-in-fact element, a plaintiff generally "must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred." *Roberts v. Benoit*, 605 So.2d 1032 (La. 1991) (citing Timothy J. McNamara, *The Duties and Risks of the Duty-Risk Analysis*, 44 LA. L. REV. 1227, 1231 (1984)). Nevertheless, "[w]here there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident."[4] *Jones v. Centerpoint Energy Entex*, 11–02 (La. App. 3 Cir. 5/25/11); 66 So.3d 539, 548 (quoting *Perkins v. Entergy Corp.*, 00–1372, 00–1387, 00–1440, p. 8 (La. 3/23/01); 782 So.2d 606, 611). Cause-in-fact is a factual

---

[4] In *Dixie Drive It Yourself System v. American Beverage Co.*, 242 La. 471, 137 So.2d 298 (1962), we stated that "conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm." *Id.* at 302. Elaborating on that pronouncement of law, we stated negligent conduct is a substantial factor if the harm would not have occurred without the conduct, i.e., but for defendant's conduct, plaintiff would not have sustained injury. Thereby, we equated the two concepts of substantial factor and necessary antecedent.

*Rando v. Anco Insulations Inc.*, 08–1163, p. 27 (La. 5/22/09); 16 So.3d 1065, 1086.

question to be determined by the factfinder, but "summary judgment may be appropriate when there is no evidence to show that the defendant's negligence caused the plaintiff's injuries." *Estate of Robinson v. Continental Cas. Co.*, 44-952, p. 12 (La. App. 2 Cir. 2010); 31 So.3d 1194, 1202; *Nettle v. Frischhertz Elec. Co. Inc.*, 2009-1404, p. 4 (La. App. 4 Cir. 2010); 40 So.3d 1144, 1147.

In this case, the Holmans contend that the "boom" Holman heard occurred when Nabors' crane operator caused a grocery box to hit a handrail near the living quarters while attempting to lift the box from the platform. The Holmans further contend that this impact was a substantial factor in the activation of the ESDDS and in Holman's injury. While it is largely undisputed that the crane operator allowed the grocery box to hit the handrail,[5] Nabors argues that it is entitled to summary judgment because the Holmans have produced no admissible evidence this incident played a substantial factor in the ESDDS activation, loss of lighting, or in Holman's injury.

Since this lawsuit was filed, eleven people have been deposed. Dupre, the Greystar Lead I & E Technician, testified that he was the person with the most knowledge about the power supply and battery back-up system that caused the ESDDS to be activated. [Doc. No. 120, Exh. D, Dupre Depo., p. 116]. He was standing about 20 feet from where the crane swung the grocery box into the hand rail. After hearing the noise, Dupre walked to the side of the platform and looked at the crane operator. He saw a cut cable before the platform went dark.

Once power was restored, Dupre began to investigate the cause of the problem. Dupre opened the battery charger in the Motor Control Center ("MCC") and saw the relay was set at 23 volts, rather than 21 volts its design called for. In Dupre's opinion, if the relay had been set at 21

---

[5]The crane operator, Roderick Wafer, testified that he has no recollection of allowing a box to strike the rig in some way. [Doc. No. 125, Exh. 4, Wafer Depo., pp. 34-46]. He does not deny the incident, but has no recollection of it. All other deponents testified that this incident occurred.

volts, the alarms would not have sounded, and the power loss would not have occurred. When the power reaches 23 volts, an alarm sounds, but Dupre believed that the alarms had been ignored because of a lack of communication between himself and the operator on duty.

Dupre specifically considered and excluded the impact of the grocery box on the handrail as a cause of the ESDDS activation. Dupre saw the box against the handrail, and there was no emergency shut down ("ESD") button between the box and the handrail, only a lighting cable. There was an ESD button in the general vicinity of the impact, but that button was protected by a metal guard to prevent accidental activation. According to Dupre, even if the grocery box had hit an ESD button, the facility would have been "shut-in" and the main turbine deactivated, but the emergency generator would have remained intact. [Doc. No. 120, Exh. D, Dupre Depo., pp. 113-14].

However, on the night of the incident, the main turbine was off and the emergency generator was not available. The system is not sensitive to impacts or vibrations, only to voltage and amperage. Dupre concluded that the improper setting of the relay in the battery charger drained the batteries to the power supply, causing the entire chain of events. Dupre concluded that the timing of the two events–the impact of the grocery box and the later ESDDS activation–was "sheer coincidence." [Doc. No. 120, Exh. D, Dupre Depo., p. 115].

Other persons involved in the incident, including Holman's supervisor, Cox, either testified consistently with Dupre or testified that they had no knowledge of what caused the chain of events. *See* [Doc. No. 120, Exh. B, Cox Depo., pp. 117-121; Exh. C, Depo. of Greystar control room operator, Ryan Hicks, pp. 48-49; Exh. E, Depo. of W-Industries I & E Technician Ben Casey, pp. 167-69; Exh. F, Depo. of UP Systems service technician, Richard Reed, pp. 128-29; Exh. G, Depo. of UP Systems service manager, Patrick Thomas, pp. 44 & 56].

Given the evidence presented by Nabors, the Holmans had to present some evidence showing that there is a genuine issue of material fact for trial that the actions of Nabors' crane operator was a substantial factor in Holman's injuries. To meet this requirement, the Holmans point to the testimony of Mark Martin ("Martin"), the lead barge supervisor for Greystar.[6] Martin testified that they "got the I & E in there" and "figured out what shut us in . . . was the inclination switches on [the] generators and power system." [Doc. No. 125, Exh. 7, Martin Depo., p. 40]. He explained that the collision from the box "tripped our generators out." *Id.* He testified further that this impact started the "initial shut-in of everything, and that is -- it hit it so hard that the abandon platform enunciation just started going off too." [Doc. No. 125, Exh. 8, Martin Depo., p. 41]. Once everything started shutting down, according to Martin, "the deluge system went off." *Id.*

At first blush, Martin's deposition testimony would appear to raise a genuine issue of material fact for trial. However, a review of Martin's testimony shows that he has no personal knowledge that the grocery box caused the activation or the generators to go offline. [Doc. No. 120, Exh. I, Martin Depo., p. 48 (Q: "Did you actually yourself go over . . . and look at this inclination switch . . . ?" A: "No.")]. He testified that he relied on hearsay statements from either "the mechanic [Burl Russell] or the I&E [Dupre]." *Id.*

Dupre clearly considered the impact of the grocery box in his investigation, but concluded within 45 minutes of beginning his investigation that the impact did **not** cause the ESDDS activation and other events. As the Holmans admit, Burl Russell ("Russell") was asleep at the time of the incident, was not involved in the investigation, and just heard about possible causes. *See* [Doc. No. 125, p. 8]. Russell testified that workers were "brainstorming what could have happened" and briefly

---

[6] The Holmans also cite to testimony of Cox and Dupre, but none of the cited testimony addresses causation. [Doc. No. 125, pp. 8-9].

considered whether the impact of the grocery box could have tripped the inclinometer and caused the ESDDS activation,[7] but quickly concluded that the impact was not the cause. [Doc. No. 120, Exh. J, Russell Depo., pp. 72-73]. Russell explained, consistently with Dupre, that an incident with the inclination switch (or inclinometer) would not have caused all of the emergency shut-in procedures to activate. [Doc. No. 120, Exh. J., Russell Depo., p. 92].

Having reviewed the extensive deposition testimony provided, the Court finds that the Holmans have failed to raise a genuine issue of material fact for trial that any action by Nabors was a substantial factor in bringing about Holman's injuries.[8]

## III. CONCLUSION

For the foregoing reasons, Nabors' Motion for Summary Judgment [Doc. No. 120] is GRANTED, and all claims against Nabors are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 15th day of December, 2014.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

---

[7]Russell denies telling Martin that the impact of the grocery box was related to the inclinometer and caused the entire event. *See* [Doc. No. 120, Exh. J, Russell Depo., p. 72]. However, even if the Court accepts for purposes of summary judgment that Russell did make such a statement to Martin, that statement must be viewed in the context of his other testimony. Namely, Russell does not deny that he, like Dupre, initially considered the impact of the grocery box as a possible cause of the later event, but ruled out that possibility.

[8]The Court has considered the Holmans' arguments that Nabors' "negligent loading of the grocery box" was the "first domino in the line," activating the chain of emergency events. [Doc. No. 125, pp. 10, 12]. However, there was never anything but speculation that the inclinometer may have been tripped, and the investigation ruled out the impact of the grocery box as the cause of events. The Holmans have presented no evidence to the contrary.