UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **DENNIS E. HOLMAN AND YOLANDA HOLMAN** | **CIVIL ACTION 11-1864** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **W-INDUSTRIES OF LOUISIANA, LLC, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

**RULING**

Pending before the Court is a Motion for Summary Judgment [Doc. No. 118] filed by Defendant UP Systems, Inc., and its Custom Power Division ("UP Systems"). Plaintiffs Dennis and Yolanda Holman ("the Holmans") have filed an opposition memorandum [Doc. No. 124], and UP Systems has filed a reply memorandum [Doc. No. 130].

For the following reasons, the Motion for Summary Judgment is GRANTED.

**I.    FACTS AND PROCEDURAL HISTORY**

UP Systems is a manufacturer of uninterrupted power equipment that is routinely used in offshore applications. Essentially, the equipment is a series of rechargeable batteries.

Plaintiff Dennis Holman ("Holman") worked as a production operator for Greystar Corporation ("Greystar") aboard the ATP Titan, a complex structure serving as both a drilling platform and production facility in the Telemark Field in the Gulf of Mexico. The Holmans brought this personal injury lawsuit after Holman slipped and fell while working on the ATP Titan.

In October of 2007, UP Systems manufactured nineteen pieces of equipment, including twelve battery chargers, which were intended to provide an uninterrupted power supply to the ATP

Titan. The equipment was installed by other contractors and/or shipyard personnel and incorporated into the ATP Titan's electrical system.[1]

The ATP Titan's Process Control System ("PCS") monitored and controlled processes on the platform when in normal operating ranges. The Process Safety System ("PSS"), also known as the Emergency Safety System, took over in emergency situations when the processes were operating outside normal ranges. The PSS monitored and controlled UP Systems' equipment, which provided backup battery power. In turn, the PSS was controlled by the Programmable Logic Control ("PLC"), which is the "brain for the platform." [Doc. No. 118, Exh. A, Deposition of Cody Dupre ("Dupre Depo."), p. 85]. All automated devices on the platform were ultimately controlled by the PLC.

Problems with UP Systems' equipment, including the 12208/4502B battery charger[2] at issue in this litigation, would manifest through the ATP Titan's common alarm system and display a fault via several screens located in the control room manned by Greystar.

Shortly before Holman's slip and fall, at Greystar's direction, W-Industries installed a shunt trip on the 12208 battery charger. Before installation of the shunt trip, if the voltage or current dropped below a set value on the battery charger's low voltage relay, an alarm would be triggered, but the battery charger would continue to operate. The shunt trip is a "circuit breaker that, in addition to tripping on overloads, can be tripped electronically; [sic] for example, at a designated low voltage." [Doc. No. 118, p. 3, n. 6]. After installation of the shunt trip, if the voltage dipped below

---

[1] According to UP Systems, its equipment was installed incorrectly in a horizontal position. [Doc. No. 118, Deposition of Richard Reed ("Reed Depo."), Exh. B, p. 59].

[2] The battery charger has been identified by both numbers, but, for ease of reference, the Court will hereafter refer only to the 12208 identification number. *See* [Doc. No. 130, Exh. F, Depo. of Richard Reed, p. 58, lines 1-3 (Q: . . "And I think we've established that 12208 is 4502B; is that right?" A: "Correct, uh-huh.").

the set value, an alarm would still be triggered, but the breaker would also trip, causing the battery charger to stop operating.

The battery chargers operated on a 24-volt system. When UP Systems manufactured the equipment, the low voltage relay factory setting should have been 21 volts, and the factory relay setting should not have been changed after installation. In order to change the setting, someone would have to use a small screwdriver to turn the relay from one setting to another. However, according to Greystar's lead instruments and electrical ("I & T") technician, Cody Dupre ("Dupre"), over time, vibrations on the platform can also "walk" the setting either higher or lower. [Doc. No. 118, Exh. A, Dupre Depo., p. 66].[3]

While W-Industries was installing the shunt trips, UP Systems' technician, Richard Reed ("Reed"), came to the ATP Titan to service the equipment. He was on the platform to address a number of issues with the equipment, including problems with battery chargers 12207 and 12208 which had previously caused the system to go on battery power on or about October 24, 2010. [Doc. No. 130, Exh. F, Reed Depo., pp. 84-85]. This incident had prompted an email from Jason Martinez ("Martinez") of W-Industries to Patrick Thomas ("Thomas") of UP Systems, but the email was not shown to Reed, and the October 24 incident was not the only reason Reed was on the ATP Titan. According to Reed, the UP Systems equipment was "quite a nasty mess" because it had been improperly installed horizontally. [Doc. No. 130, Exh. F., Reed Depo., p. 58]. In addition to working

---

[3]Dupre explained that the "setting is controlled by a little pot that you turn with a real small screwdriver . . . to determine the twenty-three (23) or twenty-one (21) or whatever you want it at. Vibration over time can walk that little pot, okay? So in the past I've seen where shunt trips tripped accidentally, you know, because it's vibrated itself to a lower setpoint or a higher setpoint . . . ." [Doc. No. 118, Exh. A, Dupre Depo., p. 66].

with W-Industries on installation of the shunt trips, Reed addressed problems with several battery chargers and problems in the hull.

As part of his work, Reed did troubleshoot the October 24th incident when the system went on battery power, but found no problems with the hardware or bad fuses. [Doc. No. 130, Exh. F., Reed Depo., p. 89]. On October 30, 2010, Reed also performed work on the 12208 battery charger to ensure that the link between the W-Industries shunt trip and the battery charger would not cause false alarms, but would indicate actual problems with the system.[4] Reed has "no recollection of having to make or check any adjustments" to the low voltage setting on the 12208 battery charger relay. [Doc. No. 118, Exh. B, Reed Depo., p. 92].[5] Reed did not perform any further work on the 12208 battery charger after October 30th, and Reed's records showed that he had not made adjustments to the relay for this battery charger during other trips to the ATP Titan. *Id.*; *see also id.* at Exh. D.

After completing work on the 12208 battery charger, Reed remained on the ATP Titan, performing other work on UP Systems' equipment. Reed finished his work and left the ATP Titan on the afternoon of November 3, 2010.

---

[4]Reed characterizes his work as advisory because the W-Industries technicians were performing the actual installation. [Doc. No. 130, Exh. F., Reed Depo, p. 89].

[5]Q: "And would it be your testimony that there would be no reason, the work that you would have been doing during November–October, November, for you to make any adjustments to the relay in connection with the installation of the shunt trips or any of the other work you were doing at the time?"

A: "I have no recollection of having to make or check any adjustments."

[Doc. No. 130, Exh. F., Reed Depo., p. 92].

In the late afternoon or early evening of November 3, 2010, the current dipped below 23 volts, an alarm sounded, the Greystar control room was notified of a problem, and the shunt trip caused the circuit breaker to trip battery charger 12208. However, Dupre had told Greystar personnel to ignore the alarms generated by the battery chargers because of the ongoing work on the battery chargers. The Greystar control room employees ignored the alarms, which continued over the next five and one-half hours, and consequently the battery for the PSS circuit was drained. The ATP Titan's PLC then allegedly interpreted the drained battery as a "worst case scenario," such as an explosion or fire, causing the Emergency Shut Down and Deluge System ("ESDDS") to activate.

On the date of the incident, Holman was in the galley eating cereal. He heard a loud "boom" and felt the platform sway. [Doc. No. 120, Exhibit A, Holman Depo., pp. 89-90].[6] Shortly thereafter, at approximately 10:30 p.m., the emergency shut-in alarm sounded, and the lights went out.

There were allegedly reports of a gas release from the process area. In response, Holman's supervisor, Deral Cox ("Cox"), sent him below the platform to "kill the electrical pump" and stop any release. *Id.*

Because the water deluge system had begun to operate, spraying the platform with tens of thousands of gallons of water in order to suppress a potential fire, the piping and deck were wet and slippery. Hydrocarbons on the stairs also made them slippery. As Holman ascended a stairwell, his grip slipped, and he stumbled backwards, falling down the stairs and injuring his back.

---

[6] It was later determined that a crane operator employed by Nabors Drilling USA, LP ("Nabors") had caused the sound when he allowed a grocery box to hit the handrail near the living quarters. However, in the Ruling [Doc. No. 142] on Nabors' Motion for Summary Judgment, the Court found insufficient evidence to raise a genuine issue of material fact for trial that the impact of the grocery box caused the ensuing emergency activation. Thus, the Court granted Nabors' Motion for Summary Judgment and dismissed all claims against this defendant. [Doc. No. 143].

After the accident, Holman returned to the control room. By that time, the lights were back on, and the emergency generator was operating. Holman was off the remainder of his shift and was taken to shore by helicopter the next day. He did not return to work.

Dupre investigated the emergency activation incident (not Holman's slip and fall) and found that the low voltage relay for battery charger 12208 had been set at 23 volts.[7] In his opinion, the incorrect setting is what caused the ensuing events. Because Reed had recently worked on the 12208 battery charger, as well as other UP Systems' equipment, Dupre assumed and stated in his report that Reed had changed the setting. However, neither Dupre nor anyone else saw Reed set the low voltage relay at 23 volts. During his deposition, Dupre also admitted that he did not want the stunt trips installed because he had previous experience with vibrations on a platform causing the relay setting to "walk" up or down.

After the November 3, 2010 incident, Dupre contacted UP Systems and was given permission and instructions on how to re-set the system to 21 volts. The shunt trips were removed approximately one week later. There were no further incidents after Dupre re-set the low voltage relay.[8] If the low voltage relay had been set at 21 volts, the loss of power would likely never have occurred.[9]

On October 21, 2011, the Holmans brought suit against W-Industries of Louisiana, LLC ("W-Industries"), asserting claims under the Outer Continental Shelf Lands Act ("OCSLA"). The

---

[7]UP Systems raises an issue as to whether Dupre used the proper method to determine the setting, but, for purposes of summary judgment, the Court assumes that Dupre was correct, and the low voltage relay was set at 23 volts.

[8]Although these facts may constitute subsequent remedial measures, the Court includes them solely to provide a complete history of the events.

[9][Doc. No. 124, Exh. 24, Reed Depo., p. 103; Exh. 39, Dupre Depo., p. 106].

Holmans originally alleged that W-Industries, which performed repair and maintenance services on the ATP Titan, was liable because its technicians negligently set the low voltage "trip level" for the ESDDS at 23 volts, which ultimately caused the scenario resulting in Holman's incident. Mrs. Holman also asserted a loss of consortium claim under Louisiana law.

On June 1, 2012, with leave of Court, the Holmans amended their Complaint. [Doc. No. 13]. As it was unclear whether the ATP Titan might be considered a vessel, rather than a platform, the Holmans amended to assert a maritime claim. The Holmans also added Emerson Network Power, Liebert Services, Inc. ("Emerson"), alleging that an Emerson employee was responsible for the 23-volt setting.

On August 10, 2012, W-Industries filed a cross-claim against Emerson and a third party demand against ATP Oil & Gas Corporation ("ATP"), Greystar, Mustang Engineering, L.P. ("Mustang"), Bluewater Industries, Inc. ("Bluewater"), and Nabors Drilling USA, LP ("Nabors"). [Doc. No. 23]. W-Industries later amended its cross-claim and third party demand to add MMR Group, Inc. ("MMR") as another third party defendant. [Doc. No. 26].

On October 1, 2012, ATP filed a suggestion of bankruptcy, resulting in a stay of proceedings against it. [Doc. Nos. 31 & 32].

On February 12, 2013, the Holmans filed a Second Supplemental and Amending Complaint, adding claims against UP Systems. The Holmans alleged that "an employee of Custom Power, a division of UP Systems . . . , was responsible for mistakenly setting the emergency shutdown mechanisms at a level at variance with the plans and specifications for such system, and further that such action caused the shutdown system to mistakenly activate, causing an emergency evacuation to initiate on the *ATP Titan* on the night of November 3, 2010, resulting in [Holman's] injury. [Doc.

No. 57, ¶ I]. The Holmans contend that UP Systems is "responsible for the negligent acts of its employee . . . either solely, or along with the other Defendants." *Id.* The Holmans then explained that they had mistakenly named Emerson and moved to dismiss their claims against that defendant. *Id.* at ¶ II.

On April 2, 2013, Mustang Engineering asserted a cross-claim against UP Systems [Doc. No. 68], and UP Systems asserted a cross claim against ATP, Bluewater, Greystar, Mustang, Nabors, and W-Industries. [Doc. No. 69].

On April 8, 2013, the Court granted UP Systems' motion to dismiss its cross-claim against ATP. [Doc. No. 72].

On August 13, 2013, the Court granted a motion for stay filed by Greystar, staying the case until the issuance of a decision by the United States Court of Appeals for the Fifth Circuit in the case of *Warrior Energy Services, Corp. v. ATP Titan M/V*, Case No. 13-30587. [Doc. No. 89].

On August 19, 2013, the Court granted the Motion for Summary Judgment filed by MMR and dismissed all claims against it. [Doc. No. 91].

On January 30, 2014, the Court lifted its stay and granted the Motion for Summary Judgment filed by Greystar. [Doc. No. 96]. Relying on the Fifth Circuit's final binding opinion in *Warrior Energy* that the ATP Titan is a non-vessel, the Court found that Greystar is immune from tort liability in this case. Thus, the Court dismissed all claims against Greystar.

On March 20, 2014, the Court granted W-Industries' voluntary motion to dismiss its claims against Bluewater, Nabors, and Mustang without prejudice. [Doc. No. 99].

On June 23, 2014, the Holmans filed a Third Supplemental and Amended Complaint adding Nabors as a Defendant. [Doc. No. 104].

On October 10, 2014, UP Systems filed the instant Motion for Summary Judgment [Doc. No. 118]. On the same day, Nabors filed a Rule 12(c) Motion for Judgment on the Pleadings [Doc. No. 119] and a Motion for Summary Judgment [Doc. No. 120].

On October 30, 2014, the Holmans filed a Memorandum in Opposition to UP Systems' Motion for Summary Judgment. [Doc. No. 127].

On December 15, 2014, the Court granted the Motion for Summary Judgment filed by Nabors and dismissed all claims against it. Nabors' Motion for Judgment on the Pleadings and a pending motion *in limine* were denied as moot. [Doc. No. 144].

On December 30, 2014, the Court granted W-Industries' voluntary motion to dismiss claims against ATP without prejudice. [Doc. No. 149].

On January 2, 2015, the Court was notified that the Holmans and W-Industries had amicably resolved their claims.

The Court is now prepared to rule on UP Systems' Motion for Summary Judgment.

**II.    LAW AND ANALYSIS**

   **A.    Standard of Review**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

### B. Negligence

The Holmans' claims against UP Systems are governed by the OCSLA, which applies Louisiana's negligence law.[10] To determine whether a plaintiff should recover on a negligence claim, Louisiana courts employ a duty-risk analysis. *Long v. State ex rel. Dept. of Transp. and Dev.*, 04-0486 (La. 6/29/05); 916 So.2d 87, 101. Under the duty-risk analysis, a plaintiff must demonstrate that (1) the defendant had a duty to conform to a specific standard of care (duty); (2) the defendant failed to conform its conduct to that standard (breach); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (cause-in-fact); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (legal causation or scope of liability); and (5) that the plaintiff

---

[10]As UP Systems correctly notes, if the Holmans claimed that the UP Systems' equipment was defective in any way, their recovery would be limited by the Louisiana Products Liability Act ("LPLA"). However, despite multiple amendments to their Complaint, the Holmans have not alleged design or manufacturing defect in the battery charger 12208, only negligence. The Holmans state in their opposition to the pending motion that "in all likelihood this problem had "existed from the time of its initial manufacturer and testing by [UP Systems'] Custom Power [Power Division] at its Houston facility," but still do not assert a products liability claim. [Doc. No. 124, p. 7].

suffered actual damages (damages). *See Mathieu v. Imperial Toy Corp.*, 94-C-0952, p. 5 (La. 11/30/94); 646 So.2d 318, 322 (citations omitted); *Long,* 916 So.2d at 101 (citations omitted). A plaintiff's failure to prove any of the elements of the duty-risk analysis results in a determination of no liability. *Lemann v. Essen Lane Daiquiris, Inc.*, 05–1095 (La. 3/10/06); 923 So.2d 627.

UP Systems raises five arguments to support its Motion for Summary Judgment: (1) *res ipsa loquitor* does not apply, (2) UP Systems had no legal duty to protect Holman from his slip and fall, (3) UP Systems' alleged negligence was not a legal cause of Holman's accident, (4) UP Systems' alleged negligence was not a cause-in-fact of Holman's accident, and, (5) even if UP Systems' alleged negligence was a cause-in-fact of Holman's accident, the intervening and superseding negligence of Greystar relieves UP Systems of liability. For the following reasons, the Court finds that UP Systems is entitled to summary judgment because UP Systems breached no duty to the Holmans, *res ipsa loquitor* is inapplicable, and, in the alternative, even if UP Systems breached a duty, its breach was not a legal cause of Holman's accident. Given these conclusions, the Court resolves the case without reaching the remainder of UP Systems' arguments.

### 1. Duty, Breach of Duty, and *Res Ipsa Loquitor*

"The threshold issue in any negligence action is whether the defendant owed the plaintiff a duty, and whether a duty is owed is a question of law." *Hanks v. Entergy Corp.*, 2006–477, p. 21 (La. 12/18/06); 944 So.2d 564, 579. "The inquiry is whether the plaintiff has any law—statutory, jurisprudential, or arising from general principles of fault—to support his claim." *Hardy v. Bowie*, 99–2821 (La. 9/8/99), 744 So.2d 606, 614. Assuming that such a duty is established, the plaintiff in a negligence action must also show that the defendant failed to conform its conduct to the applicable standard, *i.e.*, that it breached a duty owed to the plaintiff. *Mathieu*, 646 So.2d at 322.

A plaintiff may meet its evidentiary burden by providing direct or circumstantial evidence, or, if applicable, by relying on the doctrine of *res ipsa loquitor*.

In its Motion for Summary Judgment, UP Systems argues that there is no direct evidence that Reed changed the low voltage relay setting, as the Holmans asserted in their Second Supplemental and Amending Complaint, and the doctrine of *res ipsa loquitor* cannot provide a presumption of liability. UP Systems argues further that it had no legal duty through Reed "to confirm that the settings on [Greystar's] equipment remained unchanged from their original factory settings, much less to protect against slip and fall injuries." [Doc. No. 118, p. 21]. Ultimately, UP Systems contends that it had no duty to guarantee the platform's overall safety and no duty to ensure that Greystar employees, including Holman, "safely respond to emergency procedures." [Doc. No. 118, pp. 21-22].

In opposition, the Holmans argue that Reed either negligently set the low voltage relay at 23 volts, or he breached his duty to detect and correct the low voltage relay setting that "[i]n all likelihood existed from the time of [battery charger 12208's] initial manufacture and testing by [UP Systems] . . . at its Houston facility." [Doc. No. 124, p. 7]. In support of their argument that Reed should have detected the improper low voltage relay setting, the Holmans point to an October 24, 2010 incident where the platform lost 24-volt power from the charger. This specific incident prompted a request from W-Industries' technician, Martinez, to Thomas of UP Systems to send out Reed. Given Reed's knowledge that a low voltage incident occurred, the Holmans contend that he (and, through him, UP Systems), had a duty to check and correct the low voltage relay setting. He allegedly breached that duty and set in motion the chain of events resulting in Holman's slip and fall

accident. The Holmans admit that the doctrine of *res ipsa loquitor* is inapplicable, but contend that they have presented sufficient other evidence of UP Systems' duty and breach.

In its reply memorandum, UP Systems points out that the Holmans' original theory that Reed changed the setting to 23 volts has been "debunked," and they can no longer rely on this alleged duty. UP Systems then argues that the Holmans cannot establish negligence based on their new theories because they cannot prove that the low voltage relay setting was improperly set at 23 volts at the time of manufacture, and Reed "had no contractual duty to re-set the allegedly improperly set low voltage relay." [Doc. No. 130, pp. 4-5].

Assuming that UP Systems had a duty to initially set the low voltage relay at 21 volts and/or to leave that setting at 21 volts, the Court finds insufficient evidence to raise a genuine issue of material fact for trial whether those duties were breached. As UP Systems argues and as the Holmans admit, this is not a case where the doctrine of *res ipsa loquitor* applies and would permit an inference of negligence as to either of these two theories.[11] There is no direct evidence to support the Holmans' theory that the incorrect low voltage relay setting existed from the time of UP Systems' manufacture of the equipment in 2007. If Reed or someone else did not change the setting in the ensuing three years, there is only speculation that the improper setting had existed since the time of manufacture. Speculation, of course, is not competent summary judgment evidence.

---

[11]The doctrine of *res ipsa loquitur*, which means "the thing speaks for itself," permits an inference of negligence when a plaintiff establishes three criteria: that the injury is one which ordinarily does not occur in the absence of negligence, the evidence must sufficiently eliminate other more probable causes of the injury, and that the negligence of the defendant falls within the scope of his duty to plaintiff. *Linnear v. Centerpoint Energy Entex/Reliant Energy*, 2006–3030 (La.9/5/07), 966 So.2d 36, 41 (quoting *Linnear v. CenterPoint Energy Entex/Reliant Energy*, 06-41171 (La. App. 2 Cir. 8/4/06), 945 So.2d 1, 8).

There is also no direct evidence that Reed adjusted the setting on the 12208 battery charger low voltage relay to 23 volts. Reed denies changing the setting. Although Dupre, Greystar's lead I & E technician, initially stated in his report that Reed adjusted the setting, when deposed, he admitted that he had no personal knowledge that Reed did so. Further, though Dupre claimed that only UP Systems' employees worked on its battery chargers,[12] W-Industries employee, Martinez, testified that Greystar and W-Industries employees also worked on the system (although Martinez also denied changing the setting). Finally, Dupre admitted that, in his experience, vibrations on the platform can sometimes "walk" the low voltage relay setting up or down over time.

Having found that UP Systems could not have breached any duty owed based on these arguments, the Court must consider the Holmans' new argument--that the low voltage issue on October 24, 2010, imposed on Reed a duty to check the low voltage relay setting. If he had done so, the Holmans argue that he would have changed that setting to 21 volts, and none of the events of November 3, 2010, would have occurred.

There is no specific statutory or jurisprudential authority which creates the duty argued by the Holmans. Instead, the Court must consider the general principles of fault. Certainly, Reed had a duty, like any other technician, to exercise the appropriate care in performance of his repair and troubleshooting tasks. Reed came to the ATP Titan to perform a number of tasks, including issues with several battery chargers, problems with the hull, checking the problem with loss of power that occurred on October 24, 2010, and working with W-Industries on the installation of shunt trips for

---

[12]Dupre explained that only UP Systems technicians were supposed to work on its equipment because of the warranty. However, the warranty on the equipment had expired in late 2009, approximately one year before the November 3, 2010 incident. It is undisputed that after the November 3, 2010 incident, Dupre contacted UP Systems, obtained permission and instructions on changing the low voltage relay setting to 21 volts, and, apparently, changed the setting.

battery chargers. Yet, after carefully reviewing the record, the Court finds insufficient evidence, based on the facts and circumstances of this case, that Reed had a duty to specifically check the low voltage relay setting on battery charger 12208 and change it to 21 volts.

The Court has considered the testimony of Martinez, Dupre, and Reed. In an email to UP Systems supervisor, Thomas, after the October 24, 2010 incident, Martinez explained:

> On 10/24/10 the chargers **tripped the output breakers on a low DC voltage alarm but did not send the "common trouble" alarm to the control room.** The control system ran on batteries for an unknown amount of time until it shut down. We had no way of charging the batteries to bring them up past the shutdown point. . . .

[Doc. No. 124, Exh. 14, Deposition of Patrick Thomas (emphasis added)]. In his deposition, Martinez testified that, as a result of the October 24, 2010 incident:

> [the] platform lost 24-volt from one of these chargers. That's when we started looking into what happened. And, apparently, one of those low voltage relays tripped before performing the function it needed to. Probably on a **low, low** voltage[,] and it shut off. So, that's the gist of what–why I sent this here.

[Doc. No. 124, Exh. 12, Deposition of Jason Martinez, p. 12 (emphasis added)].

Although he did not personally review Martinez's email, Reed was aware of the October 24, 2010 incident. He testified that he **did** check the low voltage problem, but found "no hardware failure" and no "bad fuses" that would have caused the problem. [Doc. No. 130, Exh. F, Reed Depo., p. 89]. Reed was questioned in his deposition if he should have checked the low voltage relay setting, but responded that he had "no recollection of **having to make or check any adjustments**" to the low voltage setting on the 12208 battery charger relay. [Doc. No. 118, Exh. B, Reed Depo., p. 92 (emphasis added)]. Thus, the evidence before the Court shows that there was some type of low voltage problem, that the assigned UP Systems' technician checked that problem, and that, based on his expertise, he found no need to check the low voltage relay setting.

15

Finally, the Court reviewed the testimony of Greystar's Dupre. He testified that, while Reed was on the ATP Titan, they tested "undervoltage/overvoltage and the ground fault." [Doc. No. 118, Exh. A, Dupre Depo., p. 73]. He explained further:

Q: What do the unvervoltage/overvoltage tests consist of?

A: To go ahead and create an overvoltage alarm, make the relay pick up, watch it trip the breaker to make sure everything was wired right. And then create an undervoltage scenario and do the same thing, and then create a ground fault scenario and make sure it showed up at the control room at the charger itself and activated the shunt trip, the breaker.

*Id.* Although someone, not just Reed, could have read the meter, no one knew at what voltage the tests were performed. *Id.* at p. 74.

After considering all this testimony, the Court cannot find, as a matter of law, that UP Systems owed a duty to Greystar and its employees, including Holman, to check and detect the low voltage relay setting on battery charger 12208. The Court is aware that Reed's testimony serves the interests of his employer, but his testimony stands unrebutted that he performed all tasks he was assigned on the ATP Titan, including a check of the equipment based on the October 24, 2010 incident. Based on his skills and experience, Reed did not believe he needed to check the low voltage relay on battery charger 12208. Dupre's testimony confirms that undervoltage/overvoltage tests were conducted, but does not create an issue of fact whether Reed saw, should have seen, or needed to see the voltage setting to perform the tests.[13] Nor have the Holmans produced any other evidence that rebuts Reed's testimony and creates the legal duty they assert.

---

[13] Dupre is not a disinterested witness either, but the Court finds no issues of credibility for the jury to resolve. The Court has credited the testimony of both these witnesses. Even so, there is insufficient evidence that Reed had a duty as a matter of law to check the low voltage relay setting.

The Holmans have not produced competent summary judgment evidence that Reed, and hence UP Systems, failed to conform his conduct to the applicable standard of care. Without this evidence and because the Holmans admittedly do not and cannot rely on *res ipsa loquitor*, the Holmans cannot establish negligence. Therefore, UP Systems' Motion for Summary Judgment should be granted on this basis alone.

### 2. Legal Cause

The Court is aware, however, of the ambiguity in case law on how broadly or narrowly to construe the duty element. Indeed, it has been observed that "the duty element in the five-part formulation of the negligence-law cause of action has been called an 'unnecessary fifth wheel on the coach, incapable of sound analysis and possibly productive of injustice.'" DAVID W. ROBERTSON, *Allocating Authority Among Institutional Decision Makers in Louisiana State-Court Negligence and Strict Liability Cases*, 57 La. L. Rev. 1079, 1092 (1997). Nevertheless, even assuming *arguendo* that the Holmans could establish the duty and breach of duty elements, the Court finds, in the alternative, that they have failed to establish that such breach was the legal or proximate cause of Holman's injuries.

Legal cause is known as the scope of liability or scope of protection element. The Louisiana Supreme Court has found that there is no "'rule'" for determining the scope of duty. *Roberts v. Benoit*, 605 So.2d 1032, 1044 (La. 1991). "Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty." *Id.* (citing *Edwards v. State*, 556 So.2d 644, 648–49 (La. App. 2d Cir. 1990)). "[D]etermination of legal cause involves a purely legal question," but "this legal determination depends on factual determinations of foreseeability and ease of

association." *Rando v. Anco Insulations Inc.*, 08–1163 (La.5/22/09), 16 So.3d 1065, 1088 (citing *Todd v. State, Dep't. of Social Servs.*, 96-3090 (La. 9/9/97), 699 So.2d 35, 39). A risk may not be found within the scope of the duty where the circumstances of that injury to the plaintiff could not reasonably be foreseen or anticipated because there was no ease of association between the risk of that injury and the legal duty. *See Weaver v. Valley Elec. Membership Corp.,* 615 So.2d 1375, 1383 (La. App. 2 Cir., 1993). "The ease of association of the injury with the rule of conduct that is urged, however, is the proper inquiry." *Id.* (citing W. PROSSER, *Law of Torts* (3d Ed.1964) at 282 ff; DAVID ROBERTSON, *Reason Versus Rule In Louisiana Tort Law: Dialogues On Hill v. Lundin & Associates, Inc.*, 34 La .L. Rev. 1 (1973)). "The extent of protection owed a particular plaintiff is determined on a case-to-case basis to avoid making a defendant an 'insurer' of all persons against all harms. *Id.* (citations omitted).

For the Holmans to establish legal cause, they would have to show that Holman's slip and fall on the stairs was within the scope of Reed's alleged duty to check the low voltage relay setting. The Court finds no ease of association between the alleged duty and Holman's injuries. As UP Systems points out, its equipment functioned as it should. On November 3, 2010, when the current dipped below 23 volts, the alarm sounded, and the Greystar control room was notified that there was a problem. Additionally, the shunt trip, which had been installed by W-Industries for Greystar, also worked correctly, causing the 12208 battery charger to "trip" and stop functioning.[14]

In order for the Holmans to establish legal causation, it must have been reasonably foreseeable to UP Systems that Reed's failure to check the low voltage relay setting would result in

---

[14] Even though W-Industries was primarily responsible for installing the shunt trips, Reed coordinated with W-Industries and would have been aware that, if the current dipped below the low voltage relay setting, the 12208 battery charger would trip. Thus, there would be an ease of association with an injury caused by the tripping of the battery charger.

Holman's injury from a slip and fall on wet and oily stairs when (1) Dupre failed to tell Greystar control room employees that battery charger 12208 was now functional, and any alarms should be checked; (2) Greystar control room employees ignored the alarm sounded by the UP Systems' equipment for five and one-half hours, draining the batteries; (3) the PLC, or the "brain" for the platform, would interpret the drained batteries as a worst case scenario; and (4) Greystar would send Holman to check on a pump below the platform, even though the stairs were wet and oily and even though they had not yet determined the cause of the emergency (or even if there **was** an emergency). While the low voltage relay setting may have initiated the chain of events, the Court finds that UP Systems could not have reasonably anticipated Holman's accident and injury. Accordingly, UP Systems is entitled to summary judgment on this alternative basis.

### III. CONCLUSION

For the foregoing reasons, UP Systems' Motion for Summary Judgment [Doc. No. 118] is GRANTED, and all claims against UP Systems are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 22nd day of January, 2015.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE